23-8. And I understand that we have, on behalf of the appellees, a understanding about the splitting the oral argument time? Is that correct? Okay. It's like an hour. Wonderful. So we will hear from counsel for the appellant. Happy Halloween. Happy Halloween. Good morning. May it please the Court. J. Ryan Lopatka on behalf of the plaintiff appellant. Can you speak up just a little bit, please? Sure, of course. The district court dismissed this case on the ground that the plaintiff failed to plead an actionable misstatement or omission of material fact with regard to Boston Beer Company's truly hard seltzer product. Now, I'd just like to focus on two of the alleged misstatements and the corresponding omissions. I think they best highlight why this case is a little bit different and why it justifies reversal. The first statement comes from April 22, 2021, and this is during the company's earnings call. And before I get into the statement itself, I think it's important to recognize the context here, which is the company had just raised its guidance and tied that guidance raise directly to its truly brand hard seltzer. And this statement, it comes in response to the very first question that an analyst asks after the prepared remarks. And the analyst is asking about the guidance in relation to what that analyst perceives is a deceleration in the seltzer market. And Defendant Berwick offers a lengthy response. He cites more shelf space now for truly, that there are new channels opening up, including on premise. And he concludes his answer with, so we think, again, there's a lot of reasons why we believe that the category will actually now start to reaccelerate. And that's part of our calculation. That is unequivocally false because defendants did not believe that the seltzer market would reaccelerate now. They actually believed that it would reaccelerate two months from now in the summer. Defendant Smala admitted this. And this is where it gets interesting. Defendants in their brief concede that. You understand now to mean as he's speaking. Correct. Absolutely. So the plain language of now. And that's April. April. Exactly. Late April. And that makes sense because that quarter goes through the end of June. And you have a later statement that says we think there'll be reacceleration in April. No, we have a later statement from Mr. Smala that said that we expected the seltzer market to continue to decelerate in May and June. No, that's an interesting paraphrase because wasn't the later statement we were expecting a slowdown in May and June. That's actually absolutely correct. Because one of the things that is a little tricky about interpreting these statements is there are times when they're talking about the segment, the category. And there are times when they're talking about their own business. And I'm trying to figure out if they were talking about their own business in that category because they had shipped so much out already to the distributors, it would be perfectly consistent to say we were expecting a slowdown for us. But the category would begin to reaccelerate. And I understand your question there. I think defendant's brief actually clears this up. Because in their brief, they note on page 20 that temporary deceleration in spring 2021 didn't make the company's statement that it expected reacceleration in the summer untrue. I think they concede that they expected not only the seltzer market but their own brand to continue to decelerate through the springtime. And I think what's their position is that really that that's not what we said. What we said was we expected reacceleration in the summer. The context is after mentioning gatherings, things that happen in the summer, barbecues, beaches, and the like. Correct. And I would argue that those things aren't exclusive to summertime. I think they happen in the spring as well. But what we have here is they pit their interpretation up against ours. And they can only win at this stage if it's implausible to read the statement as we read it. And I don't see how that can possibly be the case. Do you agree that this is an opinion, a statement of opinion? Well, I think an expectation, I think you could argue, is a statement of opinion, yes. But I don't think it actually matters. It is prefaced by we believe. Correct. And I wouldn't argue that. I wouldn't argue that it's not a statement of opinion. But I'm not sure it matters here because given defendants' concessions that that's actually not what they meant, I think you have actual knowledge, subjective disbelief of that statement that now the market will start to reaccelerate. I think it's kind of a closed book at that point. Mike, would you point again to me? I mean, you mentioned some concession, but would you point again to me in the context of the complaint where it says that they actually disbelieved it and why? Why it is that you allege that it was disbelieved at that point on April 22nd? Correct. In the complaint, we cite to defendant Smalla's admission that we were expecting a slowdown in May and June. And that's the complaint at paragraph 12. I think it's page 21. Okay, but how are we to read that? So we were expecting a slowdown in May and June. Correct. The statement, the earnings call takes place on April 22nd. I'm perceptive. I'm just asking these questions so that I can understand. Totally understand. And one way to read the subsequent statement is that we were expecting a slowdown in May or June, not in April. I see what you're saying. Okay. I think some context might help. If you look to the very next question that is the very next question during the earnings call. To Mr. Berg? Correct. It's a follow-up. And it starts, I guess I wanted to ask a follow-up on something that I think you were just discussing. And the question relates to hard seltzer sales on premise. And defendant Berwick's response is we're seeing a lot of growth right now. Definitely bar calls out there for the hard seltzer brands. He uses the phrase right now three times in that follow-up answer. I think that shows that he's talking about right now. He's expecting the acceleration now. And that's the message that he gave to the market. My question is that in answer to, I take it a prior question, you referred to the statement that itself referred to May and June. Correct. And as you know, at some point after April 22nd, as you know, sometimes in some of these businesses, things change quickly. And forecasts can change quickly. So I'm trying to understand what would lead me to believe in reading the complaint that on April 22nd, as opposed to the following few months, Mr. Berwick or anyone else and the other executive at Boston Beer would know that they were going to face a deceleration rather than a reacceleration. And I understand your question, Your Honor. I think, and I don't mean to pivot from it a little bit. But you will. A little. I think what the market is being told, in effect, is for this quarter, you can expect acceleration in seltzer sales. And whether it's in April or May and June, the message that the market received was that this was going to happen in this quarter. So now means in this quarter? Correct. Yeah. Okay. One of the, again, sort of these snippets, when you put them in the broader context, when you went on to the next one and they were talking about, we're seeing a lot of progress driving distribution within that channel. It strikes me that that comment is very clearly focused on that channel, which I'm assuming from the discussion as a whole, there's a little bit of a, not a zero sum, but one draws from the other. So if you're advancing in that channel, that doesn't necessarily mean you're growing overall if that's counterbalanced by a drop in home consumption. Right? Yeah. And so I'm, I take your point about the tension between the earlier statement and then the later assertion that we were expecting a slowdown in May and June. Like, I understand that argument, but to pull in the focused statement about a specific channel, it seems to me that statement, if there is a plausible allegation that meets the pleading standard, that at that moment they weren't in fact actively selling, and of course making a lot of progress is a very subjective thing. But I don't know that that, talk to me a little bit more about how that statement ties in with the other ones, I guess. Yeah, I think what, the reason why I think they tie together, and I actually think it's the next couple of questions, it's all those questions, is that these analysts are trying to understand, in their minds they see a deceleration in the seltzer market. So they're trying to understand why are you raising your guidance right now in the face of deceleration in the seltzer market? And I think any answer that talks about why they think things are accelerating now, because it is in the context of now, he's saying present circumstances, he does see growth in the on-premise channel, I think that supports the notion of their guidance raise. I'm sorry, keep answering that question, I've got a follow-up question. Yeah, and I think it sort of allays the concerns of the market that they're seeing headwinds in the seltzer market. What is the context of Berwick's statement? Is it in the context of an earnings call for the quarter, which is ending? Or actually, the beginning of the second quarter. Correct, it's the beginning of the second quarter. Or is it sort of more of a general four-year forecast? So, I think the forecast, the increased guidance is for the entire year. Yes. But the question relates to why they're doing that right now. And so I think it's sort of a – it plays on both time periods, both in the near term and in the long term. Because obviously, you know, the year is made up of quarters, and I think it would have been a very different message to the market. What he says is, so we think based on what we've seen in some of the markets that are opening up kind of soon, not now, we will see a very strong off-premise business. And then he goes on to say, so we think again, is your point. There's a lot of reasons why the category will actually now start to re-accelerate, all in the context of providing – all in the context of the earnings call to provide some full-year guidance. Explaining their full-year guidance or their rationale for it. I've gone over quite a bit. If I could – would you like to hear about the second statement? Sure. Okay. The other statement that I'd like to talk about is – we fast-forward to June, the end of June, June 24th. And this is during the interview with Boston – I think it's Beer Business Daily. And the reason why I want to focus on that statement is that by June 24th, there can be no question that Truly had underperformed at that point in time. And defendants had known. They made multiple admissions later that they knew that in May, at least by Memorial Day, they had sort of a self-serving admission that the first signal was by Memorial Day. But even accepting that to be true, that's a full month before they give this interview. And during this interview, they speak effusively about Truly and its progress. And that has to be misleading in light of the fact that Truly, at that point in time, had underperformed. Now, we pull out a specific statement, which is that Truly is the only established player that's growing in the high double digits. Well, Defendant Berwick later admitted that in May and June, things, he said, fell from the high double digits to low double digits. Now, the district court accepted Defendant's interpretation that that later admission referred to the entire seltzer market as a whole. But that can't make sense. Because how could the whole seltzer market fall from the high double digits to low double digits when he said that Truly was the only one growing in the high double digits? But that aside, I think it was misleading to speak about Truly's growth as a positive at the end of June, four days before the end of the quarter, when they're about to announce to investors how disappointing the results were in that quarter. So given that, I think that statement was misleading to the market, absolutely. What do you understand is the time frame of the statement? Right, if you measure year to date, then what is the growth rate? So what the actual growth rate was at that point in time. Measured year to date, for example. Year to date, it appears that had fallen to the low double digits. But I'm just going off of the words as he said them, which is that they fell from the high double digits to low double digits in May and June. This is not a statement of opinion. No, this is absolutely a statement of fact. And I think it's very important to say what he didn't say, which was the omission. He didn't say anything in this interview about Truly underperforming in that point in time. So if I could reserve just a minute or maybe half a minute of rebuttal time, I'd appreciate it. Yes, you've got a minute. Thank you. We'll hear from your friends on the other side. For Boston Beer. Good morning. May it please the court, I'm George Skelly from Nixon Peabody. On behalf of the company defendant, the Boston Beer Company. Mr. Hemmer will be speaking a little bit later on behalf of the individual defendants. Your honors, the district court's well-reasoned opinion should be affirmed at bottom. This is a case about optimistic opinions about future prospects for Boston Beer. Would you return to June 24th? Pardon me? June 24th statement. Yes, your honor. Which is not a statement of opinion. We take the position it is because when you say something is in the high double digits, there's no standard as to what number may be high or low or medium. And there's a certain degree of uncertainty surrounding the use of that phrase. So he's not pinpointing a number. But it actually doesn't much matter whether it's opinion or a statement of simple fact. If I say that the number is between 25% and 30% growth, and, in fact, the number is between 10% and 15% growth, is that a statement of opinion or is that a statement of fact? You've given a specific bracketing. I would say that that's a statement of fact. So if I say it's in the 20s and the numbers are in the teens, in fact, is that a statement of opinion or a fact? That it's in the 20s? That's a harder question, I thought, your honor. Really? Yeah. But at any rate, again, your honor, I don't think for our purposes it matters here. So let's assume for our purposes that it's a statement of fact. Yes, your honor. So you still need to take into account in deciding whether this may be materially misleading or not, you need to take into account the context. And so for this statement, Mr. Berwick's statement regarding high double digits, that's demonstrably referring to a 59% year-to-date number that was reported to the market by the very same source on the prior day. And contrary to the suggestion by counsel that on a year-to-date basis it was in low double digits at that time, no. On a year-to-date basis, truly was growing at 59% at that time. So you understand the other side's argument to be that 59% is low double digits? I can't imagine that he's saying that it's low double digits. I think what's happening here is that the plaintiffs are simply not addressing this argument about year-to-date 59% that the market knew. They don't address it in their briefs anywhere. And they essentially concede that this is the background and the context that the market had. And under the Bristol-Myers case, it's appropriate to refer to the June 23rd prior day Beer Business Daily. In particular, perhaps very narrowly in this case, the June 24 Beer Business Daily itself starts off with a first sentence saying, yesterday we shared some of the latest share and trend data. So the market knew that from that very phrase and context that what Mr. Burke in the June 24 report was referring to was the prior day's numbers, which are 59% year-to-date. Yes. I guess I understood the argument to be less about the subtle distinction or not subtle distinction between high double digits and low double digits. I took the argument to be even taking folks on their own terms. There's a later admission that gives the line in the earlier statement, right? So in later July, when there's a statement that says, we saw in May and into June an inflection point where growth dropped from the high double digits to the low double digits. If that's true, that they saw in May into June, so that would be early June, then by June 24th, having seen that inflection point to come in and say we're growing in the high double digits seems inconsistent with that later concession. And that's the thing I'm trying to reconcile. The difficulty here, Your Honor, first of all, the earlier statement refers to year-to-date. The later statement is not on a year-to-date basis. It's apples and oranges. There's no comparison here. And then in addition, what you've got for the later statement is, well, I think that's the main point here is that you've got apples and oranges. What's the timeframe? I'm sorry. The later statement as well is referring to the category, whereas the earlier statement is referring to truly. Yes, Your Honor. What do you understand to be the timeframe of the later statement that Mr. Berwick references, low double digit growth rate? So that's what he's referring to is that there was at some point in, I believe he mentioned sort of the May-June timeframe, there was an inflection point where things went down. But this is important to understanding one of the arguments that the plaintiffs make newly in their reply. And that is, it's a fairly complicated little argument that earlier on Mr. Berwick said that the only player that was at the high double digits was truly. And so how could the later statement be referring to the category going down from high double digits to the low double digits if the only one up there in the first place was truly? So it couldn't be referring to the category, they argue. It's a brand new argument that they raise first time in reply. The fallacy here is that the second statement, the later statement is not referring to, doesn't tell us when, doesn't specify when earlier on the category had been in high double digits. It had been in high double digits in January, February. In fact, for the entire year 2020, the category had grown at 130%. So it's not telling you when the start of the S curve that he mentions begins. So again, that argument is based on a fallacy. If I may address, Your Honors, the reacceleration point that we've heard about, and I think this is very important. First, Mr. Berwick on April 22nd gave a several paragraph long response to a question that regarded the full year. And in that, he explained why he expected that the category will actually now start to reaccelerate. Plant takes a single word now out of context and insists it must mean immediately. But I would urge, Your Honors, to go back and reread, this is a joint appendix 0307, the actual passage there, because there's a lot of indications as to the timing of what he meant. And he explained this, and the market has his explanations. So he says that he, several of the reasons include on premise, quote, which is starting to open up, unquote. Innovation, and this is very important, which we think that will create a lot of excitement during the summer. So Mr. Berwick's giving them the timeframe for his analysis and the background for this opinion. And he himself says over the summer, during the summer rather, and occasions like the beach and that some markets that are opening up, quote, kind of soon. So he tells you the timing that he's thinking about. No one would take his statement as indicating that the market would suddenly go on, like, turn on full bore like a light switch. But even if one were to focus, take just the word now and look at it very narrowly, now, if it is supposed to mean contrary to over the summer, as he said, but if it's supposed to mean tomorrow afternoon at 3 p.m., then even then, there could very well be some reacceleration in that kind of a timeframe, followed by a dip in May, June, such as Mr. Now means now, now. If that's their argument, that now means immediately, then there could be some reacceleration starting in end of April, early May. I asked your colleague, that was my first question. And first the answer was now, meaning as he's speaking on April 22nd. It, I think, transformed over the course of the argument, because there's a logical problem with that if you're comparing it with May and June. Right, Your Honor. But I think the answer we have now, I'll ask you to respond to, is the quarter. Pardon me? The quarter. Ah. Q2, I guess. Yeah. So, I mean, he's saying it could, Q2 would include acceleration, and through the summer, for example. Because it includes April and May and June. Yeah. And in addition, again, the context here is he's talking about the trajectory for the full year. And that's what the question's about. He comes back to the full year. He says, you know, he refers to the full year. I guess the question, as he stated, that's a plausible reading, or arguably a plausible reading. But if his reading is plausible also, why does it go away on a motion to dismiss? Well, this is an opinion statement, and you need to understand the opinions, as Omnicare and the other opinion cases say, in their context, including the surrounding words. During the summer is part of the surrounding words. He says it just a couple of words before saying now. This is what the market said. Does summer not plausibly mean include June? Is that your argument? Because if it does plausibly include June, then it's contradicted by the later statement that says. There's no specificity in the later statement as to exactly when in the May-June timeframe they're talking about. It's a very vague statement. It says in May and June. Yes. It's not saying from May 1 through June 30th. It's just May-June sometime. You know, that's May-June sometime. So. Can you go back to the June 24 statements, unless there are any other questions about April? And, again, let's assume that this is a statement of fact, although I understand your argument that it's, in fact, a statement of opinion. And you say that the reference to high double digits growing at double the segment and year-to-date represents about 40% of all the growth. You're saying that there was some other subsequent statement that put this into context? Or did I misunderstand what you're- No, there's a prior Beer Business Daily, and it is the day before the June 24 one. And it's June 23, and that's at Joint Appendix 044- Where is that in the record? It's Joint Appendix 0448. 0448. And I think we quote that in our brief. Is that at page 33? That's the Boston Beer Daily. That's Beer Business Daily. It's the same publication, the identical publication. So what happens is on June 24, where he says high double digits, the very first sentence of that refers back. It says, yesterday we shared some of the latest share and brand trends. That's Joint Appendix 0452, the one that refers back to the prior statement, which is 0448, where the Beer Business Daily reports the figures the market had and understood would be the context here. Truly growth almost doubles the category trend. And while many have pointed out Seltzer's trends aren't robust enough to see the category again double, year to date in this data truly is up 59%. And so that's clearly what the second statement is referring back to. And that's information the market had and is important context for understanding the statements. And is it your intention that he is referring back or relying on the beer? Is it Beer Daily? It's Beer Business Daily. Beer Business Daily, the thing I read every day. Oh, yeah. Well, apparently if you're in this business, people do read it. Okay. Yeah. So, yes, he's referring back to the data that they reported. Now, the market had independently had the same data. Okay. This is something to be a little bit clearer about here, I hope, which is that the market had an awful lot of data. And it was reported on a weekly basis by an outfit called IRI. And all the analysts have it. And they all refer to it. And so Beer Business Daily picks this up. They see some information. And they report on it. And they ask for Boston Beer's comments on that. Boston Beer itself doesn't actually internally have sales data at the point of customer sales. Well, that's the direction of my question. Yes. So he's relying on this daily. He's relying on two things. One is the Beer Business Daily, but also at that time Boston Beer would also itself have received from a third-party vendor, IRI, Investor Research Institute, the underlying data that's being talked about here. And there are many examples in the record. One I can point you to, for example, is we requested that the court take judicial notice of an additional document here. And that's an Evercore flash note on June 24. I think we dealt with that, did we not? Yes, you did, Your Honors. And so you can take judicial notice. If you look at page three of that document, there's data, and that particular one happens to be on a prior week comparison basis. But it has the category growth. It has the truly growth data. It's all in there. The analysts have this data. The market knows what's going on from the data standpoint. And all that's happening is Mr. Berwick is commenting on the data that's out there. Thank you. So we'll hear from counsel for the individual defendants. Thank you, Your Honors, and thank you for hearing me this morning. I'm pleased to court. I'm going to address very briefly on behalf of the individual defendants. Very briefly, yes. Yeah, very briefly. An alternative ground for affirmance here, which is a failure to pleads scienter. It's suggested by the plaintiff that that could be addressed on remand if necessary. But the entire record relevant to scienter is before Your Honors. With respect to scienter, there are two things pleaded. There's with respect to actual knowledge of falsity, the relying on the public statements. And those are in the record before Your Honors. Secondly, with respect to certain statements that fall outside the PLSRA safe harbor because they're statements of fact, they also plead trading is a basis. We don't think that insider trading is a basis for inferring scienter here. None of the scholastic factors are met for the reasons articulated in Judge Nathan's opinion in City of Coral Springs. This is just not the case where people have insider traded in a way that's consistent with a fraudulent scheme. And then finally, just to make the point that Mr. Scully was making just now, these are these Evercore reports that have weekly data. They're in the record. There's also one of them at 586 through 589 of the joint appendix. And just category by category, beverage by beverage, week by week, it just makes no sense that you would have a fraudulent scheme to defraud the market as to what sales were going to be when the market gets this data on a weekly basis at an extraordinary level of granularity. So am I right that there was at least one analyst, well, this is Evercore, that directly cited the interview from June 24, the following day as a basis to continue providing a high rating? As a basis to continue providing a high rating for Boston Beer? I believe that's correct, Your Honor. So, got a note there. Yeah. So, one of the things that your friend, Mr. Scully, indicated was, I think that the market had more or less absorbed information prior to that statement being made by Berwick. But here, the very analyst at Evercore seems to have relied on this statement. And I guess if it's a misrepresentation, right, then that's a problem. Do you agree with that? Well, if it's a misrepresentation, it's a problem. But number one, we don't agree that it's a misrepresentation. And secondly, I think Evercore is relying both on what it's hearing from management and also the volumes of data that it's receiving independently from IRI. So I think Evercore is astonishingly well informed about how the week-to-week sales work out. I guess the problem that I see with the argument, and maybe it's a slight problem, but I'm being perceptive with the overall argument about absorption, is that the investment analysts were wrong. There was a loss here. So you're citing streams of information about while the market knew exactly what was going on, and it was completely wrong. So what are we to make of that? Yeah, I'm missing a little bit of your question. But I think, you know, there was the pattern here, you know, there was at all times Truly was growing over the previous year, at all times Hard Seltzer as a category was growing over the previous year. And the question is that both the company and the analysts were facing was, you know, would that growth continue and what would be the volume of the growth? And the growth, in fact, did continue throughout the year, but there were questions about how it would work out quarter to quarter and then how it would work out for the entire year. And those are forward-looking statements, and management is providing its best opinion as to that based on what they know. And, you know, to some extent, I'm sure the investor community relies on that, but they're also relying on what they themselves are seeing in the sales. Okay, so you're relying on the fact that they're forward-looking statements. Well, they're forward-looking statements, and we think necessarily not misrepresentations. There's nothing, you know, short of clairvoyance. There's no way to know with certainty what these trends will look like going forward week to week. All right, the lack of a crystal ball. Okay, thank you very much. Thank you, Your Honor. Your friend on the other side for the appellants. Judge Leo, I think you hit the nail right on the head to mention how wrong the analysts were. I just asked questions. But the Evercore analyst report that they recently put in the record, I'm kind of happy that they did put it in the record, because if you read that analyst report, it says since Sam's management rarely speaks with investors and only occasionally speaks with the trade press, we provide some highlights from CEO Dave Berwick's interview of today's issue of Beer Business Daily. And he goes on to bullet point all of these positive things about Truly, but where's the negative information? Mr. Berwick didn't have to give this interview, but once he did, he had to tell the full story about what was going on with Truly at that point in time, and it was decidedly negative. The last thing I'd like to do along the same lines is point the court to the statements of Goldman Sachs and CNBC after the company comes out with their quarterly results. They don't say that they just, you know, they missed the mark. They specifically highlight the defendant's statements during the quarter as inconsistent with the results that came out. And I'll quote this from CNBC, because I think this really is the best one. Twenty-five percent drop in the share price highlights the scale of difference in performance today relative to what the investment community expectation was. And I guess the question here is that what stage at the past quarter? I mean, Jim Cook was with us three months ago. He could not have been more positive about Truly. And clearly something has happened different from how you guided, from the tones you put out before, including mid-quarter at various conferences. When did you realize that things had slipped behind expectation, and why wasn't there some sort of more guidance along those lines to the investment community? This is from the complaint at paragraph 10, quoting CNBC. And I think that sums up what the market's reaction was, given the disparity between the mid-quarter statements and actually how Truly was performed. Thank you very much. Thank you. We will reserve the decision. The case is submitted.